UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DUNKIN' DONUTS FRANCHISED
RESTAURANTS LLC, a Delaware
limited liability company, DD IP
HOLDER LLC, a Delaware limited
liability company, BASKIN-ROBBINS
FRANCHISED SHOPS LLC, a
Delaware limited liability company, and
BR IP HOLDER LLC, a Delaware
limited liability company,

Plaintiffs,

v.                                                        Case No. 6:09-cv-216-ORL
                                                                   31 KRS

KPTT DONUTS, LLC, a Florida limited
liability company, PORT ORANGE DONUTS,
LLC, a Florida limited liability company,
KAELY DONUTS, LLC, a Florida limited
liability company, HIGHWAY 17-92 DONUTS,
LLC, a Florida limited liability company,
LMF DONUTS, LLC, a Florida limited liability
company, LONGWOOD DONUTS, LLC, a
Florida limited liability company, DMDJ
DONUTS, LLC, a Florida limited liability
company, BOSTON MANAGEMENT GROUP,
LLC, a Florida limited liability company,
NOVA DONUTS, LLC, a Florida limited
Liability company, D. MICHAEL THOMPSON,
an individual, BRIAN P. KINSLEY, an individual,
STEPHEN E. THOMPSON, an individual,
PAUL R. PAQUETTE, an individual, and
ANTONIO L. LOPEZ, an individual,

Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Dunkin' Donuts Franchised Restaurants LLC, DD IP Holder LLC, Baskin-

Robbins Franchised Shops LLC and BR IP Holder LLC (collectively, "Plaintiffs"), sue

defendants KPTT Donuts, LLC, Port Orange Donuts, LLC, Kaely Donuts, LLC, Highway 17-92

Donuts, LLC, LMF Donuts, LLC, Longwood Donuts, LLC, DMDJ Donuts, LLC, Boston Management Group, LLC, Nova Donuts, LLC, D. Michael Thompson, Brian P. Kinsley, Stephen E. Thompson, Paul R. Paquette and Antonio L. Lopez and allege:

## PARTIES

1.      Plaintiff, Dunkin' Donuts Franchised Restaurants LLC, successor-in-interest to Dunkin' Donuts Incorporated and Dunkin' Donuts LLC ("DDFR"), is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Dunkin' Donuts Franchise Agreements dated prior to May 26, 2006, have been assigned to DDFR. DDFR is engaged in the business of franchising independent business persons to operate Dunkin' Donuts shops throughout the United States. DDFR franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' Donuts and to operate under the Dunkin' Donuts system, which involves the production, merchandising, and sale of doughnuts and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and identification.

2.      Plaintiff, DD IP Holder LLC ("DDIP"), successor-in-interest to Dunkin' Donuts USA, Inc., is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. DDIP is the owner of the trademark, service mark, and trade name "Dunkin' Donuts" and related marks. DDIP has an exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops. DDFR and DDIP are collectively referred to herein as "Dunkin'" or "Dunkin' Donuts".

3.      Plaintiff, Baskin-Robbins Franchised Shops LLC ("BRFS"), successor-in-interest to Baskin-Robbins USA, Co. and Baskin-Robbins LLC, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Baskin-Robbins Franchise Agreements dated prior to May 26, 2006, have been assigned to BRFS. BRFS has been licensed to grant franchises for the operation of Baskin-Robbins stores within the area in which defendants' Baskin-Robbins franchises are located. BRFS is engaged in the business of franchising independent business persons to operate Baskin-Robbins stores throughout the United States. Baskin-Robbins franchisees are licensed to use the Baskin-Robbins trademarks, trade names, and service marks and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and information.

4.      Plaintiff, BR IP Holder LLC ("BRIP"), successor-in-interest to Baskin-Robbins Incorporated, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. BRIP is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. BRIP has the exclusive license to use these marks and trade names and has used them continuously since approximately 1947 to identify its ice cream stores, and the ice cream and other products associated with those stores. BRFS and BRIP are collectively referred to herein as "Baskin" and "Baskin-Robbins".

5.      The sole member of DDFR, DDIP, BRFS and BRIP is DB Master Finance LLC, a Delaware limited liability company. In turn, the sole member of DB Master Finance LLC is Baskin-Robbins International LLC, a Delaware limited liability company. The sole member of Baskin-Robbins International LLC is Baskin-Robbins Flavors LLC, a Delaware limited liability

3

company. The sole member of Baskin-Robbins Flavors LLC is Baskin-Robbins USA LLC, a California limited liability company. The sole member of Baskin-Robbins USA LLC is Baskin-Robbins LLC, a Delaware limited liability company. The sole member of Baskin-Robbins LLC is Mister Donut of America LLC, a Delaware limited liability company. The sole member of Mister Donut of America LLC is Dunkin' Donuts USA LLC, a Delaware limited liability company. The sole member of Dunkin' Donuts USA LLC is Dunkin' Donuts LLC, a Delaware limited liability company. The sole member of Dunkin' Donuts LLC is Dunkin' Brands, Inc., a Delaware corporation. The principal place of business of all the foregoing entities is located in Canton, Massachusetts.

6.      DDFR and BRFS operate as separate corporations, but they pursue or permit joint development of units in selected markets, which are commonly referred to as "combo" shops.

7.      Defendant, KPTT Donuts, LLC ("KPTT Donuts"), is a Florida limited liability company with its principal place of business in Orange City, Florida. At all times relevant to this action, KPTT Donuts was the owner and operator of a retail doughnut and ice cream shop located at 1142 Saxon Boulevard, Orange City, Florida 32763 (the "KPTT Shop") pursuant to a Franchise Agreement dated August 22, 2003 (the "KPTT Franchise Agreement").

8.      Defendant, Port Orange Donuts, LLC ("Port Orange Donuts"), is a Florida limited liability company with its principal place of business in Port Orange, Florida. At all times relevant to this action, Port Orange Donuts was the owner and operator of a retail doughnut and ice cream shop located at 3821 South Ridgewood Avenue, Port Orange, Florida 32119 (the "Port Orange Shop") pursuant to a Franchise Agreement dated November 10, 2003 (the "Port Orange Franchise Agreement").

9.      Defendant, Kaely Donuts, LLC ("Kaely Donuts"), is a Florida limited liability company with its principal place of business in Orlando, Florida. At all times relevant to this

4

action, Kaely Donuts was the owner and operator of a retail doughnut shop located at 2000 Orange Avenue, Orlando, Florida 32806 (the "Kaely Shop") pursuant to a Franchise Agreement dated May 25, 2006 (the "Kaely Franchise Agreement").

10.    Defendant, Highway 17-92 Donuts, LLC ("17-92 Donuts"), is a Florida limited liability company with its principal place of business in Longwood, Florida.  At all times relevant to this action, 17-92 Donuts was the owner and operator of a retail doughnut and ice cream shop located at 1000 South U.S. Highway 17-92, Longwood, Florida 32750 (the "17-92 Shop") pursuant to a Franchise Agreement dated May 25, 2006 (the "17-92 Franchise Agreement").

11.    Defendant, LMF Donuts, LLC ("LMF Donuts"), is a Florida limited liability company with its principal place of business in Lake Mary, Florida.  At all times relevant to this action, LMF Donuts was the owner and operator of a retail doughnut and ice cream shop located at 4610 W. Lake Mary Boulevard, Lake Mary, Florida 32746 (the "LMF Shop") pursuant to a Franchise Agreement dated May 25, 2006 (the "LMF Franchise Agreement").

12.    Defendant, Longwood Donuts, LLC ("Longwood Donuts"), is a Florida limited liability company with its principal place of business in Longwood, Florida.  At all times relevant to this action, Longwood Donuts was the owner and operator of a retail doughnut shop located at 801 State Road 434 W., Longwood, Florida 32750 (the "Longwood Shop") pursuant to a Franchise Agreement dated January 6, 2005 (the "Longwood Franchise Agreement").

13.    Defendant, DMDJ Donuts, LLC ("DMDJ Donuts"), is a Florida limited liability company with its principal place of business in Sanford, Florida.  At all times relevant to this action, DMDJ Donuts was the owner and operator of a retail doughnut and ice cream shop located at 3780 Orlando Drive, Sanford, Florida 32773 (the "DMDJ Shop") pursuant to a Franchise Agreement dated October 15, 2004 (the "DMDJ Franchise Agreement").

14.     Defendant, Boston Management Group, LLC ("BMG"), is a Florida limited liability company with its principal place of business in Sanford, Florida. At all times relevant to this action, BMG was the owner and operator of a retail doughnut and ice cream shop located at 4510 West State Road 46, Sanford, Florida 32771 (the "BMG Shop") pursuant to a Franchise Agreement dated March 26, 2004 (the "BMG Franchise Agreement").

15.     Defendant, Nova Donuts, LLC ("Nova Donuts"), is a Florida limited liability company with its principal place of business in Daytona Beach, Florida. At all times relevant to this action, Nova Donuts was the owner and operator of a retail doughnut shop located at 1506 S. Nova Road, Daytona Beach, Florida 32114 (the "Nova Shop") pursuant to a Franchise Agreement dated January 13, 2006 (the "Nova Franchise Agreement").

16.     Defendant D. Michael Thompson ("M. Thompson") is a natural person and a citizen and a resident of the State of Florida. Defendant M. Thompson is member of KPTT Donuts, Port Orange Donuts, Kaely Donuts, 17-92 Donuts, LMF Donuts, Longwood Donuts, DMDJ Donuts, BMG and Nova Donuts and personally guaranteed the obligations of those entities pursuant to executed personal guarantees.

17.     Defendant Brian Kinsley ("Kinsley") is a natural person and a citizen and a resident of the State of Florida. Defendant Kinsley is a member of KPTT Donuts, Port Orange Donuts, Kaely Donuts, 17-92 Donuts, LMF Donuts, Longwood Donuts, DMDJ Donuts, BMG and Nova Donuts and personally guaranteed the obligations of those entities pursuant to executed personal guarantees.

18.     Defendant Stephen E. Thompson ("S. Thompson") is a natural person and a citizen and a resident of the State of Florida. Defendant S. Thompson is a member of KPTT Donuts, Port Orange Donuts, Kaely Donuts, 17-92 Donuts, LMF Donuts, Longwood Donuts,

DMDJ Donuts, BMG and Nova Donuts and personally guaranteed the obligations of those entities pursuant to executed personal guarantees.

19.     Defendant Paul R. Paquette ("Paquette") is a natural person and a citizen and a resident of the State of Florida. Defendant Paquette is a member of KPTT Donuts, Port Orange Donuts, DMDJ Donuts and BMG and personally guaranteed the obligations of those entities pursuant to executed personal guarantees.

20.     Defendant Antonio L. Lopez ("Lopez") is a natural person and a citizen and a resident of the State of Florida. Defendant Lopez is a member of Kaely Donuts, 17-92 Donuts and LMF Donuts and personally guaranteed the obligations of those entities pursuant to an executed personal guarantee.

## JURISDICTION AND VENUE

21.     This is an action for breach of contract, trademark infringement, trade dress infringement, and unfair competition arising from, among other things, defendants' failure to comply with the provisions of the KPTT Franchise Agreement, the Port Orange Franchise Agreement, the Kaely Franchise Agreement, the 17-92 Franchise Agreement, the LMF Franchise Agreement, the Longwood Franchise Agreement, the DMDJ Franchise Agreement, the BMG Franchise Agreement and the Nova Franchise Agreement (collectively, the "Franchise Agreements"). Plaintiffs seek monetary, injunctive, and other relief against defendants for the reasons set forth below.

22.     This Court has jurisdiction over this case pursuant to the §§ 34(a) and 39 of the Lanham Act, 15 U.S.C. § 1116(a) and 1121, and 28 U.S.C. §§ 1331, 1332(a), 1338, and 1367(a) because this is an action between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### The Dunkin' Donuts System

24.     DDFR is the franchisor of the Dunkin' Donuts franchise system.

25.     DDIP is the owner of the trademark, service mark, and trade name "Dunkin' Donuts" and related marks. DDFR has a license to use and license others to use these marks and trade name and has along with its predecessors used them continuously since approximately 1960 to identify Dunkin' Donuts shops, and the doughnuts, pastries, coffee and other products associated with those shops.

26.     DDIP owns numerous federal registrations for the mark "Dunkin' Donuts" and related marks.  Among those registrations are Registration Nos. 748,901, 1,148,165, and 1,159,354. Each of these registrations is in full force and effect, and incontestable pursuant to 15 U.S.C. § 1065.

27.     The Dunkin' Donuts trademarks and trade name are distinctive and famous and have acquired secondary meaning.

28.     The Dunkin' Donuts trademarks and trade name are utilized in interstate commerce.

29.     The Dunkin' Donuts trademarks have been very widely advertised and promoted by Dunkin' Donuts over the years. Between 1971 and 2007, Dunkin' Donuts and its franchisees have spent over $1,925,000,000 in advertising and promoting the Dunkin' Donuts marks. Dunkin' Donuts spent approximately $190,000,000 in fiscal year 2007 alone in advertising and promotion.  As a result, the Dunkin' Donuts marks have been famous throughout the United States.

30.     Dunkin' Donuts and its franchisees currently operate approximately 5,600 shops in the United States and 2,000 shops outside the Untied States.  Dunkin' Donuts shops feature

Dunkin' Donuts' distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than fifty (50) years since the Dunkin' Donuts system began, millions of customers have been served in Dunkin' Donuts shops.

31.     As a result of the extensive sales, advertising, and promotion of items identified by the Dunkin' Donuts trademarks, the public has come to know and recognize the Dunkin' Donuts marks, and associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation.

### The Baskin-Robbins System

32.     BRFS is the franchisor of the Baskin-Robbins system.

33.     BRIP is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. BRFS has a license to use and license others to use these marks and trade names and has along with its predecessors used them continuously since approximately 1947 to identify Baskin-Robbins ice cream stores, and the ice cream and other products associated with those stores.

34.     BRFS is authorized to use the Baskin-Robbins' trademarks, service marks, and trade names and to sublicense Baskin-Robbins franchisees to use these trademarks and trade names.

35.     BRIP owns numerous federal registrations for the mark "Baskin-Robbins" or derivations thereof, as well as related marks. Among those registrations are Registration Nos. 1,185,045, 3,124,982 and 3,124,983. Each of these registrations is in full force and effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065.

36.     The Baskin-Robbins trademarks are used in interstate commerce.

37.     The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years.  As a result, Baskin-Robbins has become distinctive and famous throughout the United States.

38.     Baskin-Robbins and its franchisees currently operate approximately 2,500 shops in the United States and 3,000 shops outside the United States.  In the more than fifty-five (55) years since the Baskin-Robbins system began, millions of customers have been served in Baskin-Robbins shops.

39.     As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins trademarks, the public has come to know and recognize the Baskin-Robbins marks and associate them exclusively with the products and services offered by Baskin-Robbins and its franchisees.  The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.

40.     Plaintiffs have been forced to engaged undersigned counsel to represent them in this case.

41.     Plaintiffs are obligated to pay undersigned counsel a reasonable fee for professional services provided in this case.

## COUNT I

**(Breach of the KPTT Franchise Agreement – Defendant KPTT Donuts)**

42.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

43.    On August 22, 2003, DDFR, BRFS and KPTT Donuts entered into the KPTT Franchise Agreement, pursuant to which KPTT Donuts was authorized to operate the KPTT Shop.

44.    Pursuant to the KPTT Franchise Agreement, KPTT Donuts is required to pay franchise and advertising fees and other amounts to DDFR, BRFS and their affiliates.

45.    Paragraph 9.0.5 of the KPTT Franchise Agreement provides that KPTT Donuts shall be in default if it, among other things, fails to pay any obligation owed under the KPTT Franchise Agreement or any other lease or contractual obligation materially affecting the KPTT Shop.

46.    Paragraph 9.1.1 of the KPTT Franchise Agreement provides a seven (7) day cure period if KPTT Donuts fails, refuses or neglects to pay when due any monies owed under the KPTT Franchise Agreement.

47.    KPTT Donuts breached the KPTT Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDRR, BRFS and their affiliates.

48.    These breaches constitute good cause for terminating the KPTT Franchise Agreement.

49.    On February 6, 2008, DDFR and BRFS sent a Notice to Cure to KPTT Donuts demanding payment of amounts due under the KPTT Franchise Agreement and other agreements materially affecting the KPTT Shop.

50.    KPTT Donuts failed to cure the defaults set forth in the February 6, 2008 Notice to Cure.

51.    On March 21, 2008, DDFR and BRFS sent a Notice of Termination to KPTT Donuts, pursuant to which DDFR and BRFS notified KPTT Donuts that the KPTT Franchise Agreement was terminated due to KPTT Donuts' failure to cure the noticed defaults.

52.     On November 24, 2008, DDFR and BRFS sent a Notice to Cure to KPTT Donuts demanding payment of amounts due under the KPTT Franchise Agreement and other agreements materially affecting the KPTT Shop.  Many of the same defaults included in the February 6, 2008 Notice to Cure were included in the November 24, 2008 Notice to Cure.

53.     KPTT Donuts failed to cure the defaults set forth in the November 24, 2008 Notice to Cure.

54.     On January 16, 2008, DDFR and BRFS sent a Notice of Termination to KPTT Donuts, pursuant to which DDFR and BRFS notified KPTT Donuts that the KPTT Franchise Agreement was terminated due to KPTT Donuts' failure to cure the noticed defaults.

55.     Despite the Notices of Termination, KPTT Donuts continues to occupy the KPTT Shop and operate it as a Dunkin' Donuts/Baskin-Robbins shop.

56.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT II

**(Breach of the Port Orange Franchise Agreement – Defendant Port Orange Donuts)**

57.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

58.     On November 10, 2003, DDFR and Port Orange Donuts entered into the Port Orange Franchise Agreement, pursuant to which Port Orange Donuts was authorized to operate the Port Orange Shop.

59.     Pursuant to the Port Orange Franchise Agreement, Port Orange Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

60.     Paragraph 9.0.5 of the Port Orange Franchise Agreement provides that Port Orange Donuts shall be in default if it, among other things, fails to pay any obligation owed under the Port Orange Franchise Agreement or any other lease or contractual obligation materially affecting the Port Orange Shop.

61.     Paragraph 9.1.1 of the Port Orange Franchise Agreement provides a seven (7) day cure period if Port Orange Donuts fails, refuses or neglects to pay when due any monies owed under the Port Orange Franchise Agreement.

62.     Port Orange Donuts breached the Port Orange Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

63.     These breaches constitute good cause for terminating the Port Orange Franchise Agreement.

64.     On February 29, 2008, DDFR sent a Notice to Cure to Port Orange Donuts demanding payment of amounts due under the Port Orange Franchise Agreement and other agreements materially affecting the Port Orange Shop.

65.     Port Orange Donuts failed to cure the defaults set forth in the Notice to Cure.

66.     On March 21, 2008, DDFR sent a Notice of Termination to Port Orange Donuts, pursuant to which DDFR notified Port Orange Donuts that the Port Orange Franchise Agreement was terminated due to Port Orange Donuts' failure to cure the noticed defaults.

67.     On November 24, 2008, DDFR sent a Notice to Cure to Port Orange Donuts demanding payment of amounts due under the Port Orange Franchise Agreement and other agreements materially affecting the Port Orange Shop.  Many of the same defaults included in the February 29, 2008 Notice to Cure were included in the November 24, 2008 Notice to Cure.

68.     Port Orange Donuts failed to cure the defaults set forth in the November 24, 2008 Notice to Cure.

13

69.     On January 16, 2008, DDFR sent a Notice of Termination to Port Orange Donuts, pursuant to which DDFR notified Port Orange Donuts that the Port Orange Franchise Agreement was terminated due to Port Orange Donuts' failure to cure the noticed defaults.

70.     Despite the Notices of Termination, Port Orange Donuts continues to occupy the Port Orange Shop and operate it as a Dunkin' Donuts shop.

71.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT III

### (Breach of the Kaely Franchise Agreement – Defendant Kaely Donuts)

72.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

73.     On May 25, 2006, DDFR and Kaely Donuts entered into the Kaely Franchise Agreement, pursuant to which Kaely Donuts was authorized to operate the Kaely Shop.

74.     Pursuant to the Kaely Franchise Agreement, Kaely Donuts is required to pay franchise and advertising fees and other amounts to DDDFR and its affiliates.

75.     Paragraph 9.0.5 of the Kaely Franchise Agreement provides that Kaely Donuts shall be in default if it, among other things, fails to pay any obligation owed under the Kaely Franchise Agreement or any other lease or contractual obligation materially affecting the Kaely Shop.

76.     Paragraph 9.1.1 of the Kaely Franchise Agreement provides a seven (7) day cure period if Kaely Donuts fails, refuses or neglects to pay when due any monies owed under the Kaely Franchise Agreement.

77.     Kaely Donuts breached the Kaely Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

78.     These breaches constitute good cause for terminating the Kaely Franchise Agreement.

79.     On February 29, 2008, DDFR sent a Notice to Cure to Kaely Donuts demanding payment of amounts due under the Kaely Franchise Agreement and other agreements materially affecting the Kaely Shop.

80.     Kaely Donuts failed to cure the defaults set forth in the Notice to Cure.

81.     On March 18, 2008, DDFR sent a Notice of Termination to Kaely Donuts, pursuant to which DDFR notified Kaely Donuts that the Kaely Franchise Agreement was terminated due to Kaely Donuts' failure to cure the noticed defaults.

82.     On November 24, 2008, DDFR sent a Notice to Cure to Kaely Donuts demanding payment of amounts due under the Kaely Franchise Agreement and other agreements materially affecting the Kaely Shop.  Many of the same defaults included in the February 29, 2008 Notice to Cure were included in the November 24, 2008 Notice to Cure.

83.     Kaely failed to cure the defaults set forth in the November 24, 2008 Notice to Cure.

84.     On January 16, 2008, DDFR sent a Notice of Termination to Kaely Donuts, pursuant to which DDFR notified Kaely Donuts that the Kaely Franchise Agreement was terminated due to Kaely Donuts' failure to cure the noticed defaults.

85.     Despite the Notices of Termination, Kaely Donuts continues to occupy the Kaely Shop and operate it as a Dunkin' Donuts shop.

86.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT IV

### (Breach of the 17-92 Franchise Agreement – Defendant 17-92 Donuts)

87.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

88.     On May 25, 2006, DDFR and 17-92 Donuts entered into the 17-92 Franchise Agreement, pursuant to which 17-92 Donuts was authorized to operate the 17-92 Shop.

89.     Pursuant to the 17-92 Franchise Agreement, 17-92 Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

90.     Paragraph 9.0.5 of the 17-92 Franchise Agreement provides that 17-92 Donuts shall be in default if it, among other things, fails to pay any obligation owed under the 17-92 Franchise Agreement or any other lease or contractual obligation materially affecting the 17-92 Shop.

91.     Paragraph 9.1.1 of the 17-92 Franchise Agreement provides a seven (7) day cure period if 17-92 Donuts fails, refuses or neglects to pay when due any monies owed under the 17-92 Franchise Agreement.

92.     17-92 Donuts breached the 17-92 Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

93.     These breaches constitute good cause for terminating the 17-92 Franchise Agreement.

94.     On November 24, 2008, DDFR sent a Notice to Cure to 17-92 Donuts demanding payment of amounts due under the 17-92 Franchise Agreement and other agreements materially affecting the 17-92 Shop.

95.     17-92 Donuts failed to cure the defaults set forth in the Notice to Cure.

96.     On January 16, 2009, DDFR sent a Notice of Termination to 17-92 Donuts, pursuant to which DDFR notified 17-92 Donuts that the 17-92 Franchise Agreement was terminated due to 17-92 Donuts' failure to cure the noticed defaults.

97.     Despite the Notice of Termination, 17-92 Donuts continues to occupy the 17-92 Shop and operate it as a Dunkin' Donuts shop.

98.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT V

### (Breach of the LMF Franchise Agreement – Defendant LMF Donuts)

99.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

100.    On May 25, 2006, DDFR and LMF Donuts entered into the LMF Franchise Agreement, pursuant to which LMF Donuts was authorized to operate the LMF Shop.

101.    Pursuant to the LMF Franchise Agreement, LMF Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

102.    Paragraph 9.0.5 of the LMF Franchise Agreement provides that LMF Donuts shall be in default if it, among other things, fails to pay any obligation owed under the LMF Franchise Agreement or any other lease or contractual obligation materially affecting the LMF Shop.

103.    Paragraph 5.6 of the LMF Franchise Agreement provides:

**5.6    Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE.  For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be.  The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

104.    Paragraph 9.1.1 of the LMF Franchise Agreement provides a seven (7) day cure period if LMF Donuts fails, refuses or neglects to pay when due any monies owed under the LMF Franchise Agreement.

105.    LMF Donuts breached the LMF Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

106.    These breaches constitute good cause for terminating the LMF Franchise Agreement.

107.    On January 16, 2009, DDFR sent a Notice to Cure to LMF Donuts demanding payment of amounts due under the LMF Franchise Agreement and other agreements materially affecting the LMF Shop.

108.    LMF Donuts failed to cure the defaults set forth in the Notice to Cure.

109.     On January, 28, 2009, DDFR sent a Notice of Termination to LMF Donuts, pursuant to which DDFR notified LMF Donuts that the LMF Franchise Agreement was terminated due to LMF Donuts' failure to cure the noticed defaults.

110.     Despite the Notice of Termination, LMF Donuts continues to occupy the LMF Shop and operate it as a Dunkin' Donuts shop.

111.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT VI

**(Breach of the Longwood Franchise Agreement – Defendant Longwood Donuts)**

112.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

113.     On January 6, 2005, DDFR and Longwood Donuts entered into the Longwood Franchise Agreement, pursuant to which Longwood Donuts was authorized to operate the Longwood Shop

114.     Pursuant to the Longwood Franchise Agreement, Longwood Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

115.     Paragraph 9.0.5 of the Longwood Franchise Agreement provides that Longwood Donuts shall be in default if it, among other things, fails to pay any obligation owed under the Longwood Franchise Agreement or any other lease or contractual obligation materially affecting the Longwood Shop.

116.     Paragraph 5.6 of the Longwood Franchise Agreement provides:

**5.6    Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and

severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

117.    Paragraph 9.1.1 of the Longwood Franchise Agreement provides a seven (7) day cure period if Longwood Donuts fails, refuses or neglects to pay when due any monies owed under the Longwood Franchise Agreement.

118.    Longwood Donuts breached the Longwood Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

119.    These breaches constitute good cause for terminating the Longwood Franchise Agreement.

120.    On January 16, 2009, DDFR sent a Notice to Cure to Longwood Donuts demanding payment of amounts due under the Longwood Franchise Agreement and other agreements materially affecting the Longwood Shop.

121.    Longwood Donuts failed to cure the defaults set forth in the Notice to Cure.

122.    On January, 28, 2009, DDFR sent a Notice of Termination to Longwood Donuts, pursuant to which DDFR notified Longwood Donuts that the Longwood Franchise Agreement was terminated due to Longwood Donuts' failure to cure the noticed defaults.

123.     Despite the Notice of Termination, Longwood Donuts continues to occupy the Longwood Shop and operate it as a Dunkin' Donuts shop.

124.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT VII

### (Breach of the DMDJ Franchise Agreement – Defendant DMDJ Donuts)

125.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

126.     On October 15, 2004, DDFR and DMDJ Donuts entered into the DMDJ Franchise Agreement, pursuant to which DMDJ Donuts was authorized to operate the DMDJ Shop.

127.     Pursuant to the DMDJ Franchise Agreement, DMDJ Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

128.     Paragraph 5.6 of the DMDJ Franchise Agreement provides:

**5.6     Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease

obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

129.     Paragraph 9.0.5 of the DMDJ Franchise Agreement provides that DMDJ Donuts shall be in default if it, among other things, fails to pay any obligation owed under the DMDJ Franchise Agreement or any other lease or contractual obligation materially affecting the DMDJ Shop.

130.     Paragraph 9.1.1 of the DMDJ Franchise Agreement provides a seven (7) day cure period if 17-92 Donuts fails, refuses or neglects to pay when due any monies owed under the DMDJ Franchise Agreement.

131.     DMDJ Donuts breached the DMDJ Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR, BRFS and their affiliates.

132.     These breaches constitute good cause for terminating the DMDJ Franchise Agreement.

133.     On January 16, 2009, DDFR and BRFS sent a Notice to Cure to DMDJ Donuts demanding payment of amounts due under the DMDJ Franchise Agreement and other agreements materially affecting the DMDJ Shop.

134.     DMDJ Donuts failed to cure the defaults set forth in the Notice to Cure.

135.     On January, 28, 2009, DDFR and BRFS sent a Notice of Termination to DMDJ Donuts, pursuant to which DDFR notified DMDJ Donuts that the DMDJ Franchise Agreement was terminated due to DMDJ Donuts' failure to cure the noticed defaults.

136.     Despite the Notice of Termination, DMDJ Donuts continues to occupy the DMDJ Shop and operate it as a Dunkin' Donuts/Baskin-Robbins shop.

137.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT VIII

### (Breach of the BMG Franchise Agreement – Defendant BMG)

138.     Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

139.     On March 26, 2004, DDFR and BMG entered into the BMG Franchise Agreement, pursuant to which BMG was authorized to operate the BMG Shop.

140.     Pursuant to the BMG Franchise Agreement, BMG is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

141.     Paragraph 5.6 of the BMG Franchise Agreement provides:

**5.6     Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE.  For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be.  The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

142.     Paragraph 9.0.5 of the BMG Franchise Agreement provides that BMG shall be in default if it, among other things, fails to pay any obligation owed under the BMG Franchise Agreement or any other lease or contractual obligation materially affecting the BMG Shop.

143.     Paragraph 9.1.1 of the BMG Franchise Agreement provides a seven (7) day cure period if BMG Donuts fails, refuses or neglects to pay when due any monies owed under the BMG Franchise Agreement.

144.     BMG Donuts breached the BMG Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

145.     These breaches constitute good cause for terminating the BMG Franchise Agreement.

146.     On January 16, 2009, DDFR sent a Notice to Cure to BMG demanding payment of amounts due under the BMG Franchise Agreement and other agreements materially affecting the BMG Shop.

147.     BMG failed to cure the defaults set forth in the Notice to Cure.

148.     On January, 28, 2009, DDFR sent a Notice of Termination to BMG, pursuant to which DDFR notified BMG that the BMG Franchise Agreement was terminated due to BMG's failure to cure the noticed defaults.

149.     Despite the Notice of Termination, BMG continues to occupy the BMG Shop and operate it as a Dunkin' Donuts shop.

150.     As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT IX

### (Breach of the Nova Franchise Agreement – Nova Donuts)

151.    Plaintiffs reallege and incorporate paragraphs 1 through 41 above as if set forth fully herein.

152.    On January 13, 2006, DDFR and Nova Donuts entered into the Nova Franchise Agreement, pursuant to which Nova Donuts was authorized to operate the Nova Shop.

153.    Pursuant to the Nova Franchise Agreement, Nova Donuts is required to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

154.    Paragraph 5.6 of the Nova Franchise Agreement provides:

**5.6     Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

155.    Paragraph 9.0.5 of the Nova Franchise Agreement provides that Nova Donuts shall be in default if it, among other things, fails to pay any obligation owed under the Nova Franchise Agreement or any other lease or contractual obligation materially affecting the Nova Shop.

156.    Paragraph 9.1.1 of the Nova Franchise Agreement provides a seven (7) day cure period if 17-92 Donuts fails, refuses or neglects to pay when due any monies owed under the Nova Franchise Agreement.

157.    Nova Donuts breached the Nova Franchise Agreement by failing to pay franchise and advertising fees and other amounts to DDFR and its affiliates.

158.    These breaches constitute good cause for terminating the Nova Franchise Agreement.

159.    On January 16, 2009, DDFR sent a Notice to Cure to Nova Donuts demanding payment of amounts due under the Nova Franchise Agreement and other agreements materially affecting the Nova Shop.

160.    Nova Donuts failed to cure the defaults set forth in the Notice to Cure.

161.    On January, 28, 2009, DDFR sent a Notice of Termination to Nova Donuts, pursuant to which DDFR notified Nova Donuts that the Nova Franchise Agreement was terminated due to Nova Donuts' failure to cure the noticed defaults.

162.    Despite the Notice of Termination, Nova Donuts continues to occupy the Nova Shop and operate it as a Dunkin' Donuts shop.

163.    As a result of this conduct, plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

## COUNT X

### (Breach of Personal Guarantees – Defendants M. Thompson, Kinsley and S. Thompson)

164.    Plaintiffs reallege and incorporate paragraphs 1 through 41, 113 through 124 and 152 through 163 above as if set forth fully herein.

165.    In connection with execution of the Longwood Franchise Agreement and the Nova Franchise Agreement, M. Thompson, Kinsley and S. Thompson and Paquette executed a Personal Guarantee by Shareholders of a Corporation or Members of a Limited Liability Company with respect to each of those Franchise Agreements.

166.    M. Thompson, Kinsley, S. Thompson and Paquette breached the personal guarantees under the Longwood Franchise Agreement and the Nova Franchise Agreement by failing to satisfy the outstanding obligations of Longwood Donuts and Nova Donuts under the Longwood Franchise Agreement and the Nova Franchise Agreement.

167.    As a result, Plaintiffs have been damaged.

## COUNT XI

**(Breach of Personal Guarantees – Defendants M. Thompson, Kinsley, S. Thompson and Paquette)**

168.    Plaintiffs reallege and incorporate paragraphs 1 through 41, 43 through 56, 58 through 71, 126 through 137 and 139 through 150 above as if set forth fully herein.

169.    In connection with execution of the KPTT Franchise Agreement, the Port Orange Franchise Agreement, the DMDJ Franchise Agreement and BMG Franchise Agreement, M. Thompson, Kinsley, S. Thompson and Paquette executed a Personal Guarantee by Shareholders of a Corporation or Members of a Limited Liability Company with respect to each of the Franchise Agreements.

170.    M. Thompson, Kinsley, S. Thompson and Paquette breached the personal guarantees under the KPTT Franchise Agreement, the Port Orange Franchise Agreement, the DMDJ Franchise Agreement and the BMG Franchise Agreement by failing to satisfy the outstanding obligations of KPTT Donuts, Port Orange Donuts, DMDJ Donuts and BMG under those Franchise Agreements.

171.     As a result, Plaintiffs have been damaged.

## COUNT XII

### (Breach of Personal Guarantees – Defendants M. Thompson, Kinsley, S. Thompson and Lopez)

172.     Plaintiffs reallege and incorporate paragraphs 1 through 41, 73 through 86, 88 through 98 and 100 through 111 above as if set forth fully herein.

173.     In connection with execution of the Kaely Franchise Agreement, the 17-92 Franchise Agreement and the LMF Franchise Agreement, M. Thompson, Kinsley, S. Thompson and Lopez executed a Personal Guarantee by Shareholders of a Corporation or Members of a Limited Liability Company with respect to each of those Franchise Agreements.

174.     M. Thompson, Kinsley, S. Thompson and Lopez breached the personal guarantees under Kaely Franchise Agreement, the 17-92 Franchise Agreement and the LMF Franchise Agreement by failing to satisfy the outstanding obligations of Kaely Donuts, 17-92 Donuts and LMF Donuts under those Franchise Agreements.

175.     As a result, Plaintiffs have been damaged.

## COUNT XIII

### (Action for Injunctive Relief – All Defendants)

176.     Plaintiffs reallege and incorporate paragraphs 1 through 163 above, as if set forth fully herein.

177.     This is an action for injunctive relief.

178.     The Franchise Agreements provide, *inter alia,* as follows:

      a.     Paragraph 7.1 of the Franchise Agreements provides as follows:

FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks.

FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

b.     Paragraph 9.4.2 of the Franchise Agreements provides that upon termination:

FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE or FRANCHISOR; and

c.     Paragraph 9.4.3 of the Franchise Agreements provides that upon termination:

FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

d.     Paragraph 9.4.4 of the Franchise Agreements provides that upon termination:

FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law.

179.    Defendants failed to abide by the above-referenced provisions of the Franchise Agreements and continue to operate the Dunkin' Donuts and Dunkin' Donuts/Baskin-Robbins shops in violation of the Franchise Agreements.

180.    Unless restrained by this Court, Defendants will continue to operate the subject Dunkin' Donuts and Dunkin' Donuts/Baskin-Robbins shops and to use confidential information causing irreparable harm to plaintiffs which cannot be adequately remedied by compensatory damages. Therefore, plaintiffs have no adequate remedy at law.

## COUNT XIV

### (Trademark Infringement – All Defendants)

181.    Plaintiffs reallege and incorporate paragraphs 1 through 41, 43 through 56, 58 through 71, 73 through 86, 88 through 98, 100 through 111, 113 through 124, 126 through 137, 139 through 150 and 152 through 163 above as if set forth fully herein.

182.    Plaintiffs were granted registration of their various trademarks by the United States Commissioner of Patents and Trademarks.

183.    Since registering their trademarks, plaintiffs have extensively advertised their trademarks and trade names in connection with their products and services.

184.    Defendants' right to use plaintiffs' trademarks and trade names ceased when the Franchise Agreements were terminated.

185.    Notwithstanding the termination of the Franchise Agreements, Defendants continue to use plaintiffs' trademarks and trade names in the operation of their businesses in violation of the Lanham Act.

186.    Defendants' continued use and display of plaintiffs' trademarks and trade name after termination constitutes willful and intentional infringement of plaintiffs' trademarks and trade names in violation of Section 43(g) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

187.     Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

188.     Plaintiffs have suffered irreparable harm and will continue to suffer irreparable harm as a result of Defendants' infringement.

189.     Plaintiffs have no adequate remedy at law to protect their substantial business and property rights.  The damages from Defendants' activities are considerable and continuing and thus not capable of ascertainment at this time.

190.     Plaintiffs are entitled to preliminary and permanent injunctive relief preventing defendant's infringement.

### COUNT XV

### (Unfair Competition – All Defendants)

191.     Plaintiff realleges and incorporates paragraphs 1 through 41, 43 through 56, 58 through 71, 73 through 86, 88 through 98, 100 through 111, 113 through 124, 126 through 137, 139 through 150 and 152 through 163 above as if set forth fully herein.

192.     Defendants' use in commerce of plaintiffs' trademarks and trade name outside the scope of the Franchise Agreements and without plaintiffs' consent is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of their goods, services or commercial activities by another person.   Such unauthorized use of plaintiffs' trademarks and trade name constitutes unfair competition in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a), and common law.

193.     Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

194.     Plaintiffs have suffered irreparable harm and will continue to suffer irreparable harm as a result of Defendants' unfair competition.

31

195.    Plaintiffs have no adequate remedy at law to protect their substantial business and property rights.  The damages from Defendant's activities are considerable and continuing and thus not capable of ascertainment at this time.

196.    Plaintiffs are entitled to preliminary and permanent injunctive relief preventing Defendants' unfair competition.

## COUNT XVI

**(Trade Dress Infringement – All Defendants)**

197.    Plaintiff realleges and incorporates paragraphs 1 through 41, 43 through 56, 58 through 71, 73 through 86, 88 through 98, 100 through 111, 113 through 124, 126 through 137, 139 through 150 and 152 through 163 above as if set forth fully herein.

198.    Defendants' shops are identified by signs, exterior appearance, packaging, containers, and other items on which the words "Dunkin' Donuts" and "Baskin-Robbins" appear in the same lettering style and in the same distinctive color scheme as Dunkin' Donuts and Baskin-Robbins use for the doughnut and ice cream shops operated by Dunkin' Donuts and Baskin-Robbins licensees.

199.    The use by Defendants of trade dress that is identical to the Dunkin' Donuts and Baskin-Robbins trade dress outside the scope of the Franchise Agreements constitutes a false designation of the origin of those shops, which is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of their shops with the Dunkin' Donuts and Baskin-Robbins shops operated by Dunkin' Donuts and Baskin-Robbins licensees.  Such adoption of Dunkin' Donuts and Baskin-Robbins trade dress violates § 43 of the Lanham Act, 15 U.S.C. § 1125, and the common law.

200.    Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake or deceive.

32

201.    Plaintiffs have suffered irreparable harm and will continue to suffer irreparable harm as a result of Defendants' trade dress infringement.

202.    Plaintiffs have no adequate remedy at law to protect their substantial business and property rights.  The damages from Defendants' activities are considerable and continuing and thus not capable of ascertainment at this time.

203.    Plaintiffs are entitled to preliminary and permanent injunctive relief preventing defendant's trade dress infringement.

WHEREFORE, plaintiffs request the following relief:

1.    A declaratory judgment that Defendants' conduct violated the terms of the Franchise Agreements between the parties and constitutes grounds for terminating those agreements;

2.    An order ratifying and enforcing the termination of the Franchise Agreements as of the effective dates contained in the Notices of Termination;

3.    For a preliminary and permanent injunction against Defendants, and their agents, servants, employees and attorneys, and all others in active concert or participation with them, preventing them from using the Dunkin' Donuts and Baskin-Robbins trademarks, trade names, and trade dress, and from otherwise engaging in unfair competition with Dunkin' Donuts and Baskin-Robbins;

4.    For a preliminary and permanent injunction against Defendants, and their agents, servants, employees and attorneys, and all others in active concert or participation with them, enforcing all post-term obligations contained in any agreement with Defendants, including but not limited to the Franchise Agreements;

5.    For a preliminary and permanent injunction against Defendants, and their agents, servants, employees and attorneys, and all others in active concert or participation with them,

preventing them from violating the terms of the non-compete provisions of the Franchise Agreements;

      6.     For a money judgment against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of $75,000.00, for actual and consequential damages together with prejudgment interest allowed by law;

      7.     For an award equal to three (3) times the earnings and revenues obtained by Defendants as allowed by § 35 of the Lanham Act, 15 U.S.C. § 1117;

      8.     For an award of exemplary or punitive damages because of the willful, intentional, and malicious nature of Defendants' conduct;

      9.     For plaintiffs' costs, disbursements, and attorneys' fees incurred in this action, as allowed by the Lanham Act and the applicable agreements; and

      10.    For such other and further relief as the Court deems just and proper.

Dated: February 4, 2009

                                /s/ Paul D. Watson
                                Paul D. Watson
                                Florida Bar No. 957224
                                SIVYER BARLOW & WATSON, P.A.
                                401 E. Jackson Street, Suite 2225
                                Tampa, Florida 33602
                                Telephone:  (813) 221-4242
                                Facsimile:  (813) 227-8598
                                pwatson@sbwlegal.com
                                Attorneys for Plaintiffs